**Exhibit C**

**Document Title:**

Sony Administration Agreement

**Bates Range:**

RO0012 - RO0052

# Sony Administrative Agreement

This Agreement (?Agreement?), effective as of [DATE] (the ?Effective Date?), is made between:

SONY , A division of Sony Music Publishing (US) LLC () (?Publisher?), with an address of 25 Madison Avenue, 24th Floor, New York, New York 10010, on the one hand, and

Rodney Oliver, individually and d/b/a PUBLISHING ) and any and all Affiliates (?you? and ?your?), with an address ofc/o Selverne Bradford Pllc, 8335 Sunset Blvd., Suite 245, West Hollywood, CA 90069, on the other hand.

FOR GOOD AND VALUABLE CONSIDERATION, RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, PUBLISHER AND YOU HEREBY AGREE AS FOLLOWS:

1.Certain Definitions.

As used in this Agreement, the following terms shall have the meanings set forth below:

1.01"Advance" means a prepayment of royalties.  Advances under this Agreement include:  (a) all payments made under paragraph 9.02, below; (b) all other costs incurred or paid by Publisher, with your prior written consent, in connection with your creation of any Composition, or the creation of any demo authorized by you, including but not limited to travel expenses incurred by you and paid by Publisher with your consent; (c) royalty prepayments; and (d) all other monies incurred or paid by Publisher that Publisher is not otherwise specifically obligated to incur under this Agreement, and which are accepted by you as Advances, either pursuant to a writing signed by you or through your negotiation of a check from Publisher.  Notwithstanding the foregoing, Advances shall not include those amounts which Publisher is permitted hereunder to deduct from Gross Income for the purpose of calculating Net Income pursuant to paragraph 1.08 of this Agreement. Expenses constituting salaries of Publisher?s employees and Publisher?s rent and overhead will not be deemed Advances hereunder.

1.02"Affiliate? means the Controlled Songwriter and any Person (a) which you own or in which you have a controlling interest, in whole or in part; (b) which owns your publishing designee or has an interest in your publishing designee; (c) which employs you or which you employ for the purpose of writing musical compositions; or (d) the operation of which is controlled directly or indirectly by you.

1.03"Album" means one or more Phonograph Records consisting of studio master recordings totaling at

least thirty-five (35) minutes in playing time, sold in a single package.

1.04?Delivery" or "Delivered", when used with respect to a Composition, means the actual receipt by Publisher at its principal place of business in New York, New York of all of the following: (a) A digital file (or other medium acceptable to Publisher through which sound recordings embodying musical compositions are now or hereafter customarily commercially exploited) of the Composition; (b) A lyric sheet of the Composition; (c) Executed assignments of copyright and authorizations in the form of the Exhibits annexed hereto; (d) All existing copyright registrations, if any; (e) Copies of your agreements, if applicable, with any third parties regarding the Compositions (e.g., ?sample? licenses); (f) Complete and accurate writer and publisher information; (g) For any Compositions embodied on an Album released during the Term, confirmation from the Record label concerned that the Album has been released, a US mechanical royalty rate calculation relating to such Album which has been prepared by the Record label, and confirmation from the Record label that it shall not withhold payment of mechanical royalties for any reason whatsoever (Publisher will assist you in obtaining the information described in this clause (g)), and (h) Any additional information or documents concerning the Composition reasonably requested by Publisher (e.g., Sample clearances where applicable). Publisher may waive any or all formalities of your Delivery requirement with respect to any Composition or Compositions. Any such waiver shall be in writing prepared by an authorized representative of Publisher (and a writing by email shall be sufficient), and shall be deemed to be a one-time waiver, and shall not affect your obligation to comply with all formalities of Delivery with respect to all other Compositions.

1.05"Gross Income" shall mean, with respect to the rights granted by you under this Agreement: (a) all monies earned, and actually received by Publisher (or credited to Publisher against amounts previously received by Publisher) in the United States, in connection with Your Interest in the Compositions; and (b) any share of monies earned outside of the United States in connection with Your Interest in the Compositions that is received by (or credited to) Publisher's affiliated music publishing Licensees (i.e., with respect to monies earned outside of the United States [as well as monies earned in the United States], ?Gross Income? shall be calculated on an ?at source? basis), provided, however, that for purposes of accounting to you, Publisher must have received the corresponding share in the United States. Notwithstanding the foregoing, you

acknowledge that in Bulgaria, Central America (Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, Panama), Czech Republic and Slovakia, Hungary, Indonesia, Kazakhstan, Middle East (Algeria, Bahrain Egypt, Iraq, Israel, Jordan, Kuwait, Lebanon, Morocco, Oman, Qatar, Saudi Arabia, Syria, Tunisia, UAE, Yemen) Philippines, Romania, Slovenia and all former Yugoslav territories, the Compositions shall be sub-published by Publisher's unaffiliated sub-publishers; that each such unaffiliated sub-publisher may retain an actual sub-publishing fee in accordance with its existing arrangement with Publisher, such sub-publishing fee not to exceed 15% of all income received by that unaffiliated sub-publisher; and that the balance of such income after such reduction shall constitute "Gross Income" hereunder if and when remitted to Publisher in the United States. As more fully set forth in paragraph 7.02 below, all net proceeds (i.e., gross proceeds less Publisher?s actual out-of-pocket third party costs, including without limitation, outside legal fees and expenses) from any copyright infringement claim and/or copyright infringement action initiated with your consent and solely and specifically attributable to Your Interest in Compositions shall constitute Gross Income hereunder.  Gross Income shall include, without limitation, monies obtained in a judgment in or settlement of an action brought by Publisher against infringers of rights in Your Interest in the Compositions, subject to the provisions of this Agreement.

1.06"Licensee" means any Person to whom Publisher grants a license with respect to any or all of the Compositions in accordance with this Agreement, any authorized sub-licensee of such Person, and any parent, subsidiary, division and/or affiliate of Publisher, who is acting within the scope of and subject to the terms of such license.

1.07?Major Label? shall mean Sony Music Entertainment, Universal Music Group, and the Warner Music Group, or to any top-line label exclusively distributed, throughout the United States, by any of the foregoing. For the avoidance of doubt, distribution companies wholly or partly owned by or otherwise affiliated with any of the foregoing (e.g., RED Distribution) shall not be deemed to be distributed by any of the foregoing.

1.08"Net Income" shall mean Gross Income, less only the following amounts which Publisher is hereby permitted to deduct from Gross Income:  (a) reasonable and customary actual third-party out-of-pocket direct costs of collecting income regarding the Compositions; (b) reasonable actual direct out-of-pocket costs

incurred by Publisher in connection with the registration of copyrights (e.g., filing fees); (c) reasonable direct actual out-of-pocket fees paid to or charged by a third-party Society, trustee or collecting agent for the licensing of the Compositions, or an equivalent fee to be retained by Publisher if Publisher undertakes to perform the functions of the Society, trustee or licensing agent for such licensing, provided, that such amount to be retained by Publisher shall not exceed the fee charged by the third-party Society, trustee or licensing agent for the same type of exploitation and such collection fee shall not be deducted twice; (d) except as otherwise provided for herein, all expenses (including reasonable outside legal fees and actual, out-of-pocket expenses) incurred by Publisher or any Licensee in connection with any claim or suit brought by or against Publisher or any Licensee concerning the Compositions (other than those claims or suits subject to full reimbursement by you under paragraphs 16.01(e) and 16.06); (e) subject to your prior written approval, demo costs for demos not performed by you (except to the extent the parties agree that demo costs are fully recoupable Advances hereunder in accordance with paragraph 1.01); and (f) subject to your written approval, all other reasonable, actually-incurred out-of-pocket expenses related directly to the Compositions and their exploitation hereunder.  Expenses constituting salaries of Publisher?s employees and Publisher?s rent and overhead will not be deducted.  Costs incurred by Publisher in connection with a Composition co-written by the Controlled Songwriter and other songwriters signed to Publisher shall, where applicable, be allocated pro-rata and in good faith.  Sub-publishing fees deducted prior to determination of Gross Income under paragraph 1.05 above will not be deducted a second time (from Gross Income) in determining Net Income under this paragraph 1.08.

1.09?Overpayment? means (a) misapplied royalties (i.e., royalties paid by Publisher to you which should have been paid by Publisher to another Person), or (b) any payment(s) made by Publisher to you in excess of amounts due to you.  An Overpayment may result from, among other things, miscalculations by Publisher or a lack of full or accurate disclosure to Publisher of facts relevant to the calculation of any amount due to you.

1.10"Person" means any individual, corporation, company, partnership, joint venture, association or other business entity or organized group of individuals of whatever nature, and any legal successors and representatives of the foregoing.

## Sony Administrative Agreement

1.11 Phonograph Records" means sound-alone Records, including but not limited to vinyl records, tapes, tape cartridges, compact discs, mini-discs, digital music files, Digital Phonorecord Deliveries and audio DVDs.

1.12 Pipeline Monies" means Publisher's good faith estimate of (a) your share of mechanical and performance royalties collected by, received by or credited to Publisher?s music publishing company affiliates in the United Kingdom, Italy, Spain, Scandinavia, Benelux, Canada, France, Australia, Austria, Switzerland, Japan, South Korea and Germany that have not yet been paid to Publisher in the United States and (b) your share of monies that have been collected by, received by or credited to Publisher in the United States and that have not yet been reflected on accounting statements rendered to you pursuant to this Agreement.

1.13"Records" means any reproduction of a Composition in any form now known or later developed in which sounds (with or without visual images) are fixed by any method now known or later developed and from which sounds (with or without visual images) can be perceived, reproduced or otherwise communicated either directly or with the aid of a machine or device and includes the material object in which sounds with or without visual images are fixed.

1.14 Recoupment Date" means the last day of the semi-annual accounting period during which Publisher has recouped, from royalties credited to your Royalty Account (taking into account Publisher?s good-faith estimate of Pipeline Monies), all Advances paid to you under this Agreement throughout the entire Term.

1.15 SCORE" means Publisher?s online royalty portal ?SCORE?, or a successor thereof, pursuant to which royalty accounting statements and other royalty information are made available online to songwriters and other royalty participants, including you.

1.16 Societies" means public performance rights licensing organizations, mechanical rights licensing organizations, and any other similar licensing organizations, societies or entities anywhere in the Territory which administer rights in and/or uses of the Compositions.

1.17 Territory" means the Universe.

1.18"Your Interest", when used with respect to a Composition, means the percentage interest in such Composition resulting from the Controlled Songwriter?s authorship and/or ownership of that Composition;

# Sony Administrative Agreement

and ?Your Interest? in an Acquired Composition shall mean the percentage interest in such Acquired Composition acquired by you. If a Composition is both an Acquired Composition and a New or Old Composition, then ?Your Interest? shall mean the aggregate of the percentage interest resulting from the Controlled Songwriter?s authorship and the percentage interest resulting from your acquisition of rights.

Other terms defined in this Agreement shall have the meanings set forth herein.

2.Your Obligations and Publisher?s Rights.

2.01The Controlled Songwriter. You are sometimes referred to herein as ?Controlled Songwriter,? and all references to ?you and Controlled Songwriter? and the like shall be deemed to refer to you alone.

2.02During the Term, you will Deliver exclusively to Publisher Your Interest in all Compositions.

2.03Your performance of your obligations set forth in paragraph 2.02 will be deemed to have taken place in the State of New York, upon your Delivery, regardless of where you or the Controlled Songwriter reside or where the Controlled Songwriter created any or all such Compositions.

2.04During the Term and Retention Period, Publisher will have the right to be the exclusive, worldwide administrator of Your Interest in the Compositions in accordance with the terms and conditions of this Agreement.

2.05You represent and warrant that Controlled Songwriter is currently professionally known as RODNEY O and has all necessary rights to use such name in connection with his professional activities contemplated by this Agreement.

3.Term.

3.01The Term. The term of this Agreement (the ?Term?) shall begin on the Effective Date of this Agreement and shall continue, without interruption, until the later of: (a) the last day of the semi-annual accounting period during which occurs the three (3)-year anniversary of the Effective Date (the ?Calculation Date?); or (b) the Recoupment Date.

3.02Early Expiration of the Term. At any time after the Calculation Date, you shall have the right to cause the Recoupment Date to occur, and thereby terminate the Term, by sending Notice to Publisher accompanied by payment to Publisher in the amount of one hundred fifteen percent (115%) of your unrecouped Advance

balance as reflected on the then-most-recent royalty accounting rendered to you (which will be adjusted, at your request, to reflect Pipeline Monies) (the ?Repayment?). In the event you cause such early expiration of the Term to occur in accordance with this paragraph 3.02, your Royalty Account will be deemed recouped as of the end of the semi-annual accounting period during which Publisher receives the Repayment, and the Term will be deemed to expire on such date (and the Recoupment Date shall be deemed to occur on such date). In such event, for the avoidance of doubt, the portion of the Repayment that exceeds your unrecouped Advance balance will be retained by Publisher for its own account and the portion of the Repayment that equals your unrecouped Advance balance will be credited to your Royalty Account in order to ?zero it out,? i.e., cause recoupment.

3.03 (a) Publisher shall acquire no rights hereunder in the musical compositions written or acquired by the Controlled Songwriter after the end of the Term, but Publisher shall retain, throughout the Retention Period, all other rights acquired during the Term.

(b) During the Retention Period and Collection Period, Publisher shall continue to have the royalty accounting and royalty payment obligations specified in this Agreement (provided that you shall advise Publisher of any address changes in accordance with paragraph 18.01 below). All of your representations, warranties and indemnity obligations with respect to the Compositions shall remain in full force and effect at all times after the end of the Term and Retention Period. Your right to conduct a Royalty Examination under paragraph 12.03 below shall apply to statements sent by Publisher during or in respect of the Retention Period or Collection Period.

4.The Compositions.

4.01New Compositions. All of the musical compositions written by the Controlled Songwriter, alone or together with others, in whole or in part, during the Term, are hereinafter called "New Compositions." You shall Deliver to Publisher Your Interest in each New Composition immediately after creation.

4.02Old Compositions. All of the musical compositions written by the Controlled Songwriter, alone or together with others, in whole or in part, prior to the commencement of the Term, are hereinafter called "Old Compositions." Simultaneously with the execution of this Agreement, you shall Deliver to Publisher Your

Interest in each Old Composition.  You warrant and represent that:  (a) each Old Composition is listed on Schedule A annexed to this Agreement; and (b) all of the information contained on Schedule A is complete and accurate.  You further represent, warrant and agree that any musical composition which should have been listed by you on Schedule A but which is not listed thereon shall be deemed an Old Composition.

4.03 Acquired Compositions.  All of the musical compositions (in addition to the New Compositions or the Old Compositions) in which you, the Controlled Songwriter or any Affiliates of you and/or the Controlled Songwriter acquire or have acquired any ownership, control or administration interest during or prior to the Term, are hereinafter called "Acquired Compositions." You shall convey to Publisher Your Interest in each Acquired Composition immediately following acquisition in each instance. All musical compositions in which you or the Controlled Songwriter, or any Affiliates of you and/or the Controlled Songwriter have, prior to the commencement of the Term, acquired any ownership, control or administration interest shall be deemed to have been conveyed to Publisher on the Effective Date of this Agreement.

4.04 The Compositions.   The New Compositions, Old Compositions and Acquired Compositions are hereinafter collectively called the "Compositions."  Each Composition in existence at the time of the Effective Date of this Agreement shall be included on Schedule A.  All New Compositions shall be deemed included on Schedule A at the time of their creation, delivery or conveyance, as the case may be, by you, and all subsequently Acquired Compositions shall be deemed included on Schedule A following Delivery or conveyance, as the case may be, by you to Publisher hereunder in each instance. Publisher will have the right to append Schedule A, as updated with such additional Compositions, and/or excerpts of Schedule A, to the Exhibits hereto and make appropriate disposition of them.

5. Intentionally Deleted.

6. Samples.

6.01 ?Sampling,? as used herein, refers to the use and reproduction of pre-existing musical material (hereinafter, ?Sampled Material?) which is owned or controlled by any Person other than you or would not otherwise be subject to Publisher?s rights in respect of Compositions hereunder. (For the avoidance of doubt, Sampled Material does not include newly created [as opposed to pre-existing] musical material contributed by

the Controlled Songwriter?s co-writer(s), if any.)    Concurrently with your Delivery to Publisher of a Composition, you shall notify Publisher in writing of the names and addresses of all recording artists, record companies, songwriters and publishers and/or any other Persons who have any right, title or interest of any kind in any Sampled Material embodied in that Composition or in a recording embodying that Composition. As between you and Publisher, you shall be solely responsible for obtaining all consents and licenses necessary in connection with the use and reproduction, and in connection with the licensing of the use and reproduction, of any such Sampled Material, so that Publisher shall enjoy the full and perpetual rights otherwise granted to Publisher pursuant to Article 7 hereunder with respect to Compositions hereunder; at Publisher?s request, you shall supply Publisher with fully-executed copies of any such consents, licenses and other related documentation and Publisher shall abide by the terms of any such fully-executed license as it relates to such Sampled Material.  Publisher may provide (but shall not be obligated to provide) assistance to you in connection with licensing the Sampled Material. You shall be solely responsible for and shall account for and pay to any and all Persons who own or control Sampled Material any monies or other compensation to which such Persons are entitled as a result of any use hereunder by Publisher of any Composition or recording embodying such Sampled Material.  Notwithstanding anything to the contrary expressed or implied herein, no royalties, Advances or other monies shall be earned by or payable to you hereunder or otherwise in connection with any Composition embodying any Sampled Material or embodied on a recording embodying Sampled Material, and no Composition embodying Sampled Material or embodied on a recording embodying Sampled Material shall be deemed Delivered hereunder, unless and until you have obtained, on Publisher?s behalf, all rights required hereunder with respect to such Sampled Material, and, if Publisher requests, until Publisher receives documentation reasonably satisfactory to Publisher with respect thereto.

7.Grant of Rights.

7.01Intentionally Omitted.

7.02Administration.  It is the intent of the parties that Publisher and Licensees hereunder (and anyone acting under the authority of Publisher or a Licensee) shall have at all times during the Term and Retention Period, throughout the Territory, the broadest possible rights in accordance with the terms hereof to administer and

otherwise exploit Your Interest in all Compositions. Without limiting the foregoing, with respect to Your Interest in the Compositions, Publisher and its Licensees (and anyone acting under the authority of Publisher or a Licensee) shall have, and you hereby grant to Publisher, the sole and exclusive right and license during the Term and Retention Period, throughout the Territory (subject to those restrictions set forth in paragraph 7.05), to:

(a)License, and cause others to license, the exploitation of the Compositions in all forms, media and configurations, including, without limitation, the right to license: (i) broadcast and other public performances, including for use in live stage musicals and other live stage performances, (ii) the use of the Compositions in the manufacture, distribution and sale of Records and video devices, (iii) subject to paragraph 7.05, the synchronization of the Compositions in connection with motion pictures, television programs, videos and commercials, (iv) subject to paragraph 7.05, the use of the Compositions in connection with merchandising activities, (v) the reproduction of Compositions in any and all audiovisual uses of any kind (and each and every configuration which may embody the same), whether now known or hereafter devised, including without limitation, so-called enhanced CDs, DVDs, home video devices, videogames and other means of reproducing, distributing or transmitting Compositions in conjunction with visual images and (vi) the exploitation of the Compositions in any configurations and technologies now known or hereafter to become known in respect of which musical compositions may, now or in the future, be licensed, including, without limitation, all digital distributions and transmissions (e.g., ?digital downloads,? ?streams? and telephonic uses) and Internet uses.

(b)Print, publish, rent and/or sell (and authorize others to print, publish, rent and/or sell), alone or together with other works, printed editions or other reproductions of the Compositions, whether any such reproduction is in the form of printed materials, or other technological means for reproducing printed words, text or music.

(c)Collect all monies derived from any source whatsoever during the Term and the Retention Period, with respect to the Compositions, in addition to all monies earned in the Territory with respect to the Compositions and due prior to the Effective Date of this Agreement, but excluding any songwriter share of public performance income. Further, for a period of one (1) year following the expiration of the Retention Period for

# Sony Administrative Agreement

monies earned during the Term or Retention Period in the United States, and eighteen (18) months following the expiration of the Retention Period for monies earned during the Term or Retention Period elsewhere in the Territory (individually and collectively, the ?Collection Period?), Publisher shall have the sole and exclusive right to collect all monies earned by reason of uses of the Compositions made during the Term and/or the Retention Period.

(d)In addition to any rights granted to Societies regarding the Compositions, Publisher shall have the right to license public performance uses of the Compositions directly (?Direct Performance Licenses?) and all income received by Publisher in connection with such license shall be deemed Gross Income and subject to accounting pursuant to this Agreement. With respect to income deriving from Direct Performance Licenses, Publisher shall have the right to recoup Advances only from the "publisher's share" of such income, and the ?writer?s share? of such income, if collected by Publisher, shall be paid to you in accordance with the accounting provisions of this Agreement, but without deduction or regard to recoupment of Advances.

(e)Subject to paragraph 7.05, make arrangements of, or otherwise adapt or change, any one or more Compositions in any manner.

(f)Claim and collect, together with you, music-publishing industry awards.

(g)Otherwise administer, grant any and all rights with respect to, and (subject to paragraph 7.03) initiate and settle any and all claims concerning, the Compositions.

7.03Power of Attorney. You hereby irrevocably authorize, empower, and appoint Publisher your true and lawful limited attorney, for the Term and Retention Period, solely to: secure and renew the copyrights in the Compositions for the initial and any renewal and/or extension periods for Publisher's and your benefit; subject to your prior written consent in each instance, to initiate and/or compromise any claim or action against infringers of rights in the Compositions; and to execute in your name any and all documents and/or instruments necessary or desirable to accomplish solely the foregoing and/or to evidence your ownership of the copyrights (including, without limitation, such registrations of copyright interest as Publisher may deem advisable) during such periods and/or to effectuate Publisher's rights hereunder (if you fail to execute any such document and/or instrument within 10 business days after such document or instrument has been

submitted to you).  The power granted herein is coupled with an interest and is irrevocable during the Term and Retention Period. Publisher will, at appropriate times, cause the copyrights in the Compositions to be registered in your name. The preceding requirement to obtain your prior written consent to the initiation and/or compromise of infringement claims shall not apply with respect to claims, actions, or settlements with respect to any alleged infringer of rights in a significant portion (whether in number or economic value) of Publisher?s catalog, such as, by way of example, an unlicensed streaming service.

7.04 Names and Likenesses.  During the Term and Retention Period, Publisher and its Licensees each shall have the right, and may grant to others the right, to reproduce, print, publish, or disseminate, in any medium now known or hereafter to be known, your name and the name of the Controlled Songwriter, and approved portraits, approved pictures and approved likenesses of you and the Controlled Songwriter (including, without limitation, the name RODNEY O and all other professional, group, and other assumed or fictitious names used by you or the Controlled Songwriter), and approved biographical material concerning you or the Controlled Songwriter: (i) solely in connection with uses of the Compositions (including, but not limited to, print uses of the Compositions); and (ii) for the purpose of indicating your and the Controlled Songwriter?s association with Publisher during the Term and Retention Period.  Accordingly, you agree, at Publisher's request, to furnish Publisher with such biographies and likenesses of you and the Controlled Songwriter as may be available to you during the Term and Retention Period. All photographs, biographies and likenesses submitted by you shall be deemed approved by you for the uses for which such materials were submitted.  If Publisher desires to use any likeness not supplied by you or biographical material different from that supplied by you, you shall have the right to approve same in advance of use.  Such approval shall be deemed to have been given 10 business days following your receipt of such material unless you notify Publisher to the contrary within that 10-business day period.  Notwithstanding the foregoing, any inadvertent, non-repetitive failure by Publisher to obtain the aforesaid approval shall not be deemed a breach of this Agreement, provided, that Publisher shall use reasonable efforts to prospectively cure such failure.  During the Term, you and the Controlled Songwriter shall not authorize any Person other than Publisher to use your names or likenesses or the Controlled SongRODNEY OLIVER or likenesses (or any professional, group, or other

assumed or fictitious name used by you and the Controlled Songwriter) in connection with your music publishing activities related to the Compositions (other than in connection with the writer?s share of public performances).

7.05Licensing Restrictions.  Notwithstanding anything to the contrary contained in this Agreement, during the Term and Retention Period and throughout the Territory, Publisher will not (except in the case of so-called ?blanket? catalog licenses or settlements) do any of the following without your prior written consent:

(a)   make or authorize any fundamental changes to the words, music, harmonic structure, and/or title of any Composition hereunder (except authorizing foreign translations thereof) or any parody of such Composition; provided, however, that any changes to the words and/or music of any Composition in a third party musical arrangement resulting from any change not authorized in a mechanical license granted by Publisher voluntarily in the ordinary course of business or involuntarily as a result of the compulsory mechanical license provisions of the U.S. Copyright Act shall not be deemed to be a violation by Publisher of this provision. Notwithstanding the foregoing, Publisher shall not, without your prior consent, authorize a third party translator to acquire a copyright interest in the Composition by virtue of writing the lyrics for a foreign translation or arrangement, unless a payment of royalties or transfer of copyright is required by applicable law or Society Regulation in the country of translation.  Publisher shall use reasonable efforts to notify you if a payment of royalties or transfer of copyright is required by a Society in the country of the Territory concerned, but Publisher?s inadvertent and non-repetitive failure to do so shall not be deemed a breach of this Agreement;

(b) license synchronization rights for Your Interest in any Composition in any theatrical motion picture or a direct-to-video motion picture;

(c) grant licenses authorizing synchronization of Your Interest in any Composition for featured use in a television program (including, for purposes hereof, television-style programming created for Netflix, Amazon and similar outlets), videogame or computer game, commercial or advertisement (including, for the avoidance of doubt, religious and political endorsements) or other audio-visual work;

(d)    license Your Interest in any Composition for use in connection with any sponsorships, endorsements or the commercial merchandising of any product or service excluding sheet music, sound recordings, audiovisual recordings or live musical appearances by the Controlled Songwriter;

(e)license Your Interest in any Composition as a ?sample? or interpolation in a third-party master recording or musical composition (provided that Publisher will not be in breach if the Composition was actually ?sampled? prior to Publisher?s receipt of a license request therefor);

(f)license Your Interest in any Composition for so-called ?grand rights?; or

(g)grant a mechanical license for the reproduction of any Composition on Phonograph Records at a rate that is lower than one-hundred percent (100%) of the then-current minimum statutory rate, unless such reduced rate has been agreed by you (or an Affiliate) in any Recording Agreement signed by you (or an Affiliate) or it is customary in the music publishing industry to grant such license at a lower rate.

Your consent for any of the above uses will not be unreasonably withheld and will be deemed granted unless Publisher has received your rejection of such use within five (5) business days following your receipt of Publisher?s written request for consent, which, for purposes hereof, may be e-mailed to you c/o  or a successor representative designated by you at any time with reasonable Notice to Publisher, and any such request will be deemed received on the date of email transmission.

7.05.1If the Controlled Songwriter writes a New Composition specifically to be recorded by a particular recording artist (including you), and if you notify Publisher thereof simultaneously with your Delivery to Publisher of such New Composition or at any time thereafter but prior to any license having been granted by Publisher (a ?Hold?), then Publisher agrees that it shall not issue a ?first-use? mechanical license for a recording of such Composition performed by a Person other than the artist designated by you (or other license for the initial commercial exploitation of the Composition, such as a synchronization license)  unless you otherwise consent in writing prior to issuance of such license or unless required by applicable law or Society regulation.  However, Publisher shall not be required to continue any particular Hold for more than one (1) year after Publisher?s receipt of your Hold request.  Your consent to the issuance of a mechanical license of the type described in the preceding sentence is hereby deemed granted for any such recording for

which the Controlled Songwriter is the artist, producer or executive producer.

7.06 Film Music. If, during the Term, the Controlled Songwriter desires to write one or more new musical compositions (Your Interest in such compositions is sometimes referred to as "Film Music") for a film, television or other audiovisual project (?Film Project?), then Publisher agrees that, notwithstanding anything to the contrary in this Agreement, Publisher shall (i) furnish the Controlled Songwriter?s writing services on a "loan out" basis to write such Film Music, (ii) permit, if necessary and if you request, the film company or other third party to acquire up to 50% of the copyright in or 50% of the financial administration of the so-called ?publisher?s share? of such Film Music, and (iii) negotiate and enter into "loan out" and other agreements relating to the use of the Film Music in the Film Project (subject to your approval of the relevant terms thereof), provided, that:

(A) You shall in no event retain less than 50% of the copyright in such Film Music, and Publisher shall in no event retain less than 50% of the administration rights in the ?publisher?s share? of such Film Music, and 100% of the administration rights in the so-called ?writer?s share? of such Film Music (other than the writer?s share of public performance income), for the Term and Retention Period;

(B) Such Film Music shall in all other respects be deemed to be "Compositions" under this Agreement;

(C) In no event will Publisher be required to waive a market-rate synchronization or other license fee for the use of such Film Music in a Film Project, and if no separate market-rate synchronization or license fee payable to Publisher is negotiated in connection with such Film Project, then a portion of the so-called "creative fee" paid for the creation of such Film Music shall be allocated to Publisher as a synchronization or license fee, the amount of which portion shall be mutually agreed by Publisher and you, and the balance of such "creative fee" shall be paid to you directly by the film company. All additional income derived from the use of such Film Music in connection with the Film Project shall be deemed "Gross Income" under this Agreement and subject to accounting in accordance with the terms of this Agreement unless otherwise agreed in such ?loan out? agreement;

(D) In no event will you be entitled to, or will Publisher agree to, convey to the film company or other third party any share of copyright if the Film Music concerned was not written specifically for the Film-Related

Project and/or if the Film Music is not actually embodied in the film concerned; and

(E)In no event will you negotiate any agreement with respect to Film Music without Publisher?s full participation.

7.07Society Regulations.  You acknowledge that certain Societies in the Territory may impose regulations (the "Regulations") applicable to the licensing of musical compositions in the country or countries concerned, including, without limitation, with respect to blanket licensing of musical compositions.  Notwithstanding anything herein (including without limitation, any requirement that Publisher obtain your approval with respect to any such use of any Composition), any exploitation hereunder of the Compositions in a manner consistent with the Regulations, or otherwise in connection with a blanket license or blanket settlement made by Publisher with respect to a significant portion of its owned and/or administered music-publishing catalog, shall be deemed to be in full compliance with all of the terms of this Agreement.

7.08Waiver of Moral Rights.  Except where specifically reserved to you hereunder, as between you and Publisher, you hereby waive, for the Term and Retention Period, any and all so-called ?moral rights? of any kind that you may have in and with respect to the Compositions, or any Composition, to the full extent you may do so under applicable law or regulation.  The foregoing provision is not meant to limit or modify your right to consent to certain uses of the Compositions as described in Paragraph 7.05 above.

7.09Execution of Documents.  You shall execute and deliver to Publisher such instruments of transfer and other documents regarding the rights of Publisher in the Compositions subject to this Agreement as Publisher may reasonably request to carry out the purposes of this Agreement, including, without limitation, the applicable Exhibits attached to and made a part of this Agreement.

8.Retention Period.

8.01Notwithstanding the termination or expiration of the Term, Publisher shall retain all rights acquired by it under this Agreement in each country of the Territory for a period (the ?Retention Period?) commencing on the expiration of the Term and ending on the last day of the semi-annual accounting period during which occurs the two (2)-year anniversary of the expiration of the Term.

8.02Upon the end of the Retention Period, all rights with respect to Your Interest in the Compositions

(including all copyright and administration rights in and to the Compositions) will automatically revert to you, subject to Publisher?s collection rights during the Collection Period under paragraph 7.02(c) above. Publisher shall execute such documents as you reasonably request in writing to evidence the rights in any Composition which have reverted to you in accordance with the terms of this paragraph 8.02, and you shall have the sole obligation to notify Licensees, Societies, Record companies and all other parties-in-interest that the Retention Period has ended and that you (and not Publisher) are entitled to collect your share of monies earned from exploitations of the Compositions made after the end of the Retention Period. In no event will Publisher be in breach of this Agreement or an infringer of your copyright rights if Publisher collects such monies due to your failure to comply with the preceding sentence, and/or any failure by any Licensee, Society, Record company or other party-in-interest to pay any such monies directly to you, provided that Publisher remits to you, your share of any such monies collected by Publisher, which shall be paid to you in full by Publisher in accordance with the accounting provisions of this Agreement, except that Publisher shall retain an administration fee equal to ten percent (10%) of Gross Income in lieu of the royalty rates set forth in Article 9 below. Publisher shall at your request use reasonable efforts to provide you with information for the purpose of assisting you in verifying the accuracy of such payments. The foregoing shall not be deemed to limit Publisher?s collection rights under paragraph 7.02(c) above.

9.Advances.

Publisher may recoup Advances from any and all royalties (other than the so-called ?songwriter share? of public performance income) credited at any time to your Royalty Account pursuant to this Agreement.

9.02Provided that you are in compliance with all of your applicable, material warranties, representations and obligations provided for in this Agreement, during the Term, Publisher agrees to pay you an Advance totaling One Million Two Hundred Fifty Thousand Dollars ($1,250,000), payable as follows:

(a)Execution Advance. Eight Hundred Thousand Dollars ($800,000), payable promptly following the complete execution of this Agreement (and all exhibits and schedules) (the ?Execution Advance?). As an accommodation to you, Publisher shall pay Twelve Thousand Dollars ($12,000) out of the Execution Advance directly to your representatives Selverne Bradford PLLC (?Your Counsel?); and such monies shall be paid on

your behalf to Your Counsel at the address indicated on the fully completed and signed W-9 I.R.S. tax form on record with Publisher (or as subsequently furnished by Your Counsel). Publisher?s compliance with this authorization will constitute an accommodation to you alone, and nothing herein contained shall cause Your Counsel to be deemed a beneficiary of or party to this Agreement. This payment to Your Counsel shall constitute payment to you for all purposes under this Agreement, and Publisher will have no liability to you or Your Counsel by reason of any erroneous payment Publisher may make or failure to comply with this authorization. You hereby indemnify and hold Publisher harmless against any claims asserted against Publisher by reason of any such payment or otherwise in connection with this paragraph 9.02(a).

(b)Backend Advance. Subject to paragraph 9.03 below, Four Hundred Fifty Thousand Dollars ($450,000) (the ?Backend Advance?), payable promptly following Publisher?s receipt of Notice from you accurately and truthfully confirming that (i) the ?Claim? has been formally resolved (either through a final judgment by a court of competent jurisdiction, or a final, fully executed, binding settlement agreement or other written documentation confirming such Claim has been fully resolved), and (ii) Your Interest in the Composition titled ?Like That? (recorded by Future, Kendrick Lamar, and Metro Boomin) equals fifty percent (50%) (or other percentage amount subject to paragraph 9.03 hereinbelow) of the total authorship interest of ?Like That,? provided that such Notice is accompanied by a truthful and accurate copy of the corresponding final, fully executed resolution paperwork concerning the Claim (whether such paperwork is a final, signed written judgment or fully executed settlement agreement or other confirming documentation) accompanied with the final, confirmed authorship splits confirming the Controlled Songwriter?s fifty percent (50%) authorship interest in ?Like That? (the ?Claim Release Notice?). The Claim Release Notice shall be subject to Publisher?s good-faith independent verification. For the purposes of this paragraph 9.02(b), the ?Claim? shall mean the infringement/interpolation claim sent to you on behalf of Barry White Family Trust on May 7, 2024 alleging that you and the other songwriters of ?Like That? embodied a portion of the musical composition titled ?I?m Gonna Love You Just A Little More, Baby? in ?Like That.?

9.03The Backend Advance provided in paragraph 9.02(b) applies only if Your Interest in ?Like That? is finalized and confirmed to be at least fifty percent (50%). If Your Interest in ?Like That? is less than fifty

percent (50%), then Publisher shall pay, in lieu of the full Backend Advance, an Advance equal to the product of (i) Four Hounded Fifty Thousand Dollars ($450,000) and (ii) a fraction, the numerator of which is the percentage of Your Interest in ?Like That,? and the denominator of which is fifty percent (50%). In no event shall such fraction exceed 1.

9.04If Publisher makes an Overpayment to you in connection with an Advance, or otherwise, Publisher may elect to require you immediately to reimburse Publisher for the amount of that Overpayment. Alternatively, and without limitation of Publisher?s rights under this Agreement or otherwise, Publisher, in its sole discretion, shall have the right to deduct the amount of that Overpayment from any amounts otherwise payable or becoming payable to you by Publisher.

10.Royalties.

10.01Royalty Account. Publisher shall establish one royalty account for you pursuant to this Agreement (the ?Royalty Account?) to which all royalties will be credited, and all Advances will be charged.

10.02Royalty Rates. Publisher shall credit your Royalty Account with the following aggregate, all-inclusive royalties derived from Publisher?s exploitation, throughout the Territory, of Your Interest in the Compositions:

(a)Public Performance Income. Seventy percent (70%) of Net Income derived from the ?publisher's share? of public performance income collected by Publisher with respect to Your Interest in the Compositions.

(b)Mechanical Royalty Income. Eighty-five percent (85%) of Net Income derived from the licensing of Your Interest in the Compositions for use in Phonograph Records.

(c)Synchronization and Commercials Income and Video Uses. Eighty-five percent (85%) of Net Income derived from the synchronization licensing by Publisher of Your Interest in the Compositions for commercials, motion pictures, television programs, videos and other audiovisual uses, works and/or devices.

(d)Other Income. Eighty-five percent (85%) of Net Income derived from exploitations of Your Interest in the Compositions not specifically referred to in this paragraph 10.02, including, but not limited to, print exploitations where Publisher has licensed print rights to a third party. If Publisher exercises print rights directly (rather than through a print Licensee), then Publisher shall have the right to pay you a royalty based on the retail selling price of the printed editions concerned in accordance with industry standards.

# Sony Administrative Agreement

10.04 Payments Received by You.  Any direct or indirect payment or credit to you with respect to the Compositions (other than the songwriter share of public performance income paid directly to you) shall, except as otherwise expressly provided hereunder, be promptly reported and turned over to Publisher for accounting under this paragraph 10.  If you fail to so report or turn over such payment or credit to Publisher, then, without limitation of Publisher?s other rights, Publisher shall be entitled to debit your Royalty Account in the amount of any such payment or credit after giving Notice to you.

10.05 Retention of Income.  Publisher shall have the right to retain, for its account, all monies received by Publisher in connection with the Compositions that exceed the amounts payable to you pursuant to this Agreement.

11. Intentionally omitted.

12. Royalty Accountings.

12.01 Publisher will determine what royalties, if any, are due you as of each June 30th and December 3lst for the prior six (6) months.  Publisher reserves the right to alter such accounting periods without Notice, but in no event shall Publisher account less frequently than every six (6) months.  On or about the next September 30th or March 3lst (or if Publisher alters the accounting periods, on or about the date ninety (90) days following the end of the period concerned) Publisher will send you a statement of your Royalty Account, and will pay you any net royalties that are due after Publisher has recouped, from royalties credited to your Royalty Account at any time, all Advances and other charges or expenses that Publisher is entitled to recoup under this Agreement.  Publisher will not be required to send you a royalty payment for any period in which the royalties accrued to your account will be one hundred dollars ($100.00) or less; such royalties shall be held and paid along with the next statement requiring payment in excess of one hundred dollars ($100.00), but Publisher will nevertheless send you a royalty statement. Publisher will maintain reasonable royalty reserves with respect to print income in an amount not exceeding reserves permitted pursuant to the terms of Publisher's print agreements (such reserves shall not exceed twenty-five percent (25%), which such reserves to be liquidated equally over the subsequent four (4) semi-annual accounting periods. If Publisher makes any Overpayment to you, then at Publisher?s election in accordance with paragraph 9.03, you will promptly

reimburse Publisher therefor; to the extent not promptly reimbursed, Publisher may deduct the Overpayment from any payments due or becoming due to you.

12.02 Exploitation of Compositions outside the United States is hereinafter called "foreign exploitation." Publisher will compute royalties for any foreign exploitation in the same national currency in which Publisher's Licensees pay Publisher for that exploitation, and Publisher will credit those royalties at the same rate of exchange at which the Licensees pay Publisher.  For purposes of accounting to you, Publisher will treat any foreign exploitation as an exploitation occurring during the same six-month period in which Publisher receives its Licensee's accounting and payment for that use, but not later than the accounting period following the accounting period during which Publisher?s Licensee receives payment for that exploitation.  Publisher will use reasonable efforts to have its Licensees to account to Publisher in a timely and reasonable manner in accordance with industry standards.  If any Publisher Licensee deducts any taxes from its payments to Publisher, Publisher may deduct a proportionate amount of those taxes from your royalties.  If any law, any government ruling, or any other restriction affects the amount of the payments which a Publisher's Licensee can remit to Publisher, Publisher may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittance to Publisher.  If, after a final audit of its tax returns (included amended returns) by the Internal Revenue Service, or after expiration of the statute of limitations applicable to such audit, Publisher has claimed and is allowed a foreign tax credit against its U.S. income taxes for all, or a portion of, any taxes withheld by Publisher?s affiliated Licensee from its royalty remittances to Publisher with respect to Compositions, the amount of such tax credit attributable to your royalties, to the extent utilized by Publisher, will be credited to your Royalty Account.  Such amount will be reasonably determined by Publisher in good faith; such determination will be conclusive and you will not be entitled to examine Publisher?s tax returns, or any portion of them.  If Publisher cannot collect payment for any foreign exploitation in the United States in United States Dollars, Publisher will not be required to account to you for that exploitation, except as specified in the following two sentences.   Publisher will, at your request and at your expense, deduct from the monies so blocked and deposit in a foreign depository designated by you, the equivalent in local currency of the royalties that would be payable to you on the foreign sales concerned, to the extent such monies are

available for such purposes. All such deposits will constitute royalty payments to you for accounting purposes.

12.03 Publisher will maintain books and records which reflect reports to Publisher of exploitation of Compositions, which are used by Publisher in calculating your Royalty Account (the ?Royalty Records?). If you wish to verify the accuracy of a statement of your Royalty Account, you agree, for orderly processing and administration, to strictly follow either the procedures set forth in paragraph 12.03(a), or the procedures set forth in 12.03(b), below.

(a) Examination: You may, at your own expense, appoint a certified public accountant (?CPA?) to examine, and make copies of relevant portions of, the Royalty Records (a ?Royalty Examination?). In the event you choose to conduct a Royalty Examination, the following procedures must be strictly followed:

(i) You must provide Notice of intent to conduct a Royalty Examination (?Examination Notice?) with respect to a particular royalty statement or statements within three (3) years following the date on which Publisher sends you such statements in accordance with this Agreement. Following receipt of your Examination Notice, Publisher shall schedule commencement of the Royalty Examination.

(ii) Each Royalty Examination must be conducted by a CPA, business manager or other professional experienced in music industry audits (?CPA?), and such CPA must, prior to commencement of the Royalty Examination, execute Publisher's standard form confidentiality agreement then in effect (with requested revisions customarily agreed to by Publisher). Your CPA may not conduct a Royalty Examination for you if he or his firm has begun an examination of Publisher's books and records for any Person except you, unless that examination has been concluded. Notwithstanding the preceding sentence, if Publisher notifies you that the CPA designated by you to conduct an examination of Publisher's books and records under paragraph 12.03(a), or the accounting firm with which he or she is associated, is engaged in an examination of Publisher on behalf of another Person (the "Other Examination"), you may nevertheless have your examination conducted by that CPA, and the running of the time within which such examination may be made shall be suspended until your CPA has completed the Other Examination, subject to the following conditions:

(A) You shall notify Publisher of your election to that effect within 30 days after the date of Publisher's said

# Sony Administrative Agreement

Notice to you;

(B)Your CPA shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and Publisher; and

(C)Your CPA?s examination:  (1) shall not be commenced before the delivery to Publisher of the final report on the Other Examination; (2) shall be commenced within 45 days thereafter; and (3) shall be conducted in a reasonably continuous manner.

(iii)Neither you nor your CPA will be entitled to examine any Royalty Records that do not specifically report exploitation of the Compositions.  An Examination Notice, and the corresponding Royalty Examination, shall cover those statements of your Royalty Account sent by Publisher to you within the three years preceding your Examination Notice.  You may conduct only one Royalty Examination with respect to any particular statement of your Royalty Account.

(iv)A Royalty Examination must take place only during Publisher's usual business hours, and only at the place where Publisher keeps the Royalty Records, which is currently at its administrative offices located in Nashville, TN.

(v)The fieldwork for each Royalty Examination must be completed within 60 days from its commencement. Any report in which you or your CPA disputes any aspect of a statement of your Royalty Account (?Your Examination Report?) must be in writing and delivered to Publisher within 60 days after the completion of the Royalty Examination.

(b)Notice of Objection:  In the event you elect not to conduct a Royalty Examination, but nevertheless wish to object to, or assert a claim with respect to or relating to, a statement of your Royalty Account, and wish to preserve any such claim, you shall give Publisher specific written Notice of any objection to a particular statement of your Royalty Account, and your reasons for such objection in reasonable detail, within three (3) years after the date Publisher sends you such statement of your Royalty Account under paragraph 12.01.

(c)Binding After Three Years.  Irrespective of whether you conduct a Royalty Examination or object pursuant to paragraph 12.03(b), each statement of your Royalty Account will become conclusively binding on you at the end of that three-year period, and you will have no further right to make any objections to it, or to make

any claim with respect to or relating to it. Notwithstanding the foregoing, provided you have made a timely objection or claim in accordance with the requirements of paragraphs 12.03(a) or 12.03(b) as applicable, any lawsuit with respect to such objection or claim must be brought not later than one (1) year after the end of the applicable three (3) year period.

(d) FAILURE TO STRICTLY ADHERE TO EITHER THE PROCEDURES CONTAINED IN PARAGRAPH 12.03(a) or 12.03(b) WILL CONSTITUTE A WAIVER OF YOUR RIGHT TO OBJECT TO OR DISPUTE THE PARTICULAR STATEMENT OF YOUR ROYALTY ACCOUNT WITH RESPECT TO WHICH YOU FAILED TO FOLLOW THE PROCEDURES, OR TO ASSERT ANY CLAIM CONCERNING OR RELATING TO SUCH STATEMENT.

12.04 Upon your election to access your royalty information hereunder via SCORE (and provided statements are made available via SCORE for the period concerned), Publisher shall be deemed to have fulfilled all of its obligations under this Agreement to send you a statement of your Royalty Account on the date on which such statement has been made available to you on SCORE.

12.05 If you commence suit on any controversy or claim concerning or relating to royalties under this Agreement, the scope of the proceeding will be limited solely to the determination of the amount, if any, of the royalties due; and, the court will have no authority to consider any other issues or award any relief or remedy except recovery of any royalties found owing. Your recovery of any such royalties will be the sole relief or remedy available to you by reason of any claim related to Publisher's royalty accountings. Without limiting the generality of the preceding sentence, you will not have the right to seek rescission or termination of this Agreement, or avoid the performance of your obligations under it, or to impair any executory rights of Publisher by reason of any such claim. The preceding three sentences shall not apply to any item in any royalty accounting if you judicially establish that item was fraudulently misstated by Publisher.

13. Intentionally Deleted.

14. Matching Right.

14.01 For the purposes of this paragraph 14, the following terms shall have the following meanings:

(a) ?Convey? or ?Conveyance? shall refer to the grant, sale, assignment, license, transfer, encumbrance, or

other conveyance, directly or indirectly, of any Interest.

(b)?Interest? shall mean any right or interest of any kind whatsoever (not already conveyed to or controlled by Publisher) in or with respect to (i) your and/or Controlled Songwriters? publishing designee or any other Affiliate (in each case, solely to the extent applicable to Compositions), and/or (ii) the Compositions or any of them, or any portion thereof. An ?Interest? includes, without limitation, the right to publish, administer, purchase, encumber, collect and/or retain income derived from, any musical composition(s) described in the preceding sentence.

(c)?Matching Right Period? shall mean the Term and the Retention Period with respect to any Interest.

(d)?Third Party Offer? shall mean a bona fide offer from a third party (?Third Party?) for the Conveyance of an Interest.

14.02If at any time during the Matching Right Period you and/or the Controlled Songwriter desire to Convey or consider the Conveyance of any Interest, then you shall first give an opportunity to Publisher exclusively to negotiate with you in good faith the Conveyance of such Interest to Publisher. In such circumstances, you shall give Publisher Notice of such desire or consideration. Upon receipt of such Notice, Publisher shall have the exclusive right to negotiate with you for such Conveyance for a period of thirty (30) business days (the ?First Negotiation Period?). During such First Negotiation Period, you shall negotiate solely and exclusively with Publisher, and you shall not negotiate with any third party with respect to such potential or contemplated Conveyance.  In the event (a) Publisher declines in writing to negotiate with you for such Conveyance of such Interest during the First Negotiation Period or (b) you and Publisher are unable, during the First Negotiation Period, to reach agreement as to the material commercial terms for such Conveyance of such Interest, and provided you have fully complied with the provisions of this subparagraph 14.02, then you may thereafter enter into negotiations with third parties in respect of the Conveyance of such Interest, subject to paragraph 14.03 below.

14.03If at any time during the Matching Right Period you and/or the Controlled Songwriter receive a Third Party Offer and you and/or the Controlled Songwriter desire to accept such Third Party Offer, you agree that Publisher shall have the exclusive right to match the Third Party Offer in accordance with its material

commercial terms. Accordingly, you must promptly following your receipt of the Third Party Offer give Publisher Notice setting forth all of the material terms and conditions of the Third Party Offer, and shall simultaneously furnish to Publisher a complete bona fide copy of the Third Party Offer (and all related documents, including, without limitation, the relevant Third Party?s specific acknowledgement of Publisher?s rights pursuant to this paragraph).  If Publisher agrees by Notice to you to match the material terms and conditions of the Third Party Offer within twenty (20) business days after your full compliance with the immediately preceding sentence, then you shall promptly Convey the Interest solely to Publisher (subject to your right to decline Publisher?s offer to Convey the Interest to Publisher, provided you do Convey such Interest to a Third Party). If Publisher does not give you Notice accepting such Third Party Offer within such twenty (20) business day period, then you will have the right to accept the Third Party Offer, provided that any Conveyance of an Interest by you to such third party must be consummated within the ensuing ninety (90) days, and may only be consummated upon the same (or more favorable for you) terms and conditions as contained in the Third Party Offer. If such Conveyance of an Interest to a third party is not so consummated, then you shall not Convey any Interest during the Matching Right Period  without again first offering to Convey such Interest to Publisher pursuant to these terms. Publisher shall not be required, as a condition of matching any Third Party Offer, to agree to any terms or conditions that are unique to and/or can only be performed by the Third Party, or to agree to any terms or conditions not directly related to the Conveyance of such Interest.

14.04    Notwithstanding anything to the contrary, nothing herein shall permit (a) a Conveyance by you of any Interest otherwise prohibited by the terms of this Agreement or which in any way conflicts with or otherwise affects Publisher?s rights or your obligations hereunder, or (b) a Conveyance of any Interest which you are not legally entitled or have the capacity to Convey, or are capable of Conveying.

14.05    You shall not at any time during the Matching Right Period Convey (or offer to Convey) an Interest, nor shall any Third Party acquire an Interest, except strictly in accordance with this paragraph 14.  The provisions of this paragraph 14 are for Publisher?s benefit and may, by specific written Notice to you, be waived in whole or in part, at any time, by Publisher.

15.Intentionally Deleted.

16.Additional Warranties, Representations, Covenants and Agreements; Restrictions, Waivers, Indemnities.

16.01You warrant, represent, covenant and agree that:

(a)You have the full right, power, authority and legal capacity to enter into, deliver, and fully perform this Agreement and each and every term hereof.  Except as otherwise expressly provided herein, neither you, the Controlled Songwriter nor Your Interest in the Compositions (or any rights therein) are or may become subject to any contractual or other prohibition affecting your obligations hereunder or rights granted to Publisher hereunder, including without limitation, so-called ?matching rights,? or  ?collection rights.?  This Agreement constitutes a valid and binding agreement of you and the Controlled Songwriter, is enforceable against you and the Controlled Songwriter in accordance with its terms, and grants to Publisher the rights and licenses purportedly granted hereunder.

(b)Except for the Claim, Your Interest in the Compositions and all rights therein are your sole property and are, and shall throughout the Term and Retention Period be, free from any claims, liens and encumbrances of any kind whatsoever by any Person, including, but not limited to, claims of defamation, copyright infringement, trademark infringement, Lanham Act violation, moral rights violation, and/or invasion of privacy. During the Term and Retention Period, you will promptly give Notice to Publisher of any such claim.  As of the Effective Date, except for the Claim, you and the Controlled Songwriter do not know of any such claim, nor have any information which, upon reasonable inquiry, would cause you or the Controlled Songwriter to learn of any such claim.

(c)Subject to final resolution of the Claim, no (i) Composition; (ii) name used by you or the Controlled Songwriter (either individually or as a member of a group) during the Term or Retention Period, or (iii) other musical, dramatic, artistic or literary material, idea, or other intellectual property furnished or selected by you or the Controlled Songwriter and contained in or used in connection with the Compositions, or any use thereof, does or at any time will violate any law or infringe upon any other work or violate any rights in any other work or the rights of any Person, including, without limitation, such Person's contractual rights, publicity rights, privacy rights, intellectual property rights (e.g., copyrights, moral rights, and trademark, trade name,

# Sony Administrative Agreement

service mark and similar rights), nor will any of the foregoing items violate any other law or regulation, including, without limitation, the laws of libel, defamation, slander, obscenity or product liability, or otherwise result in any liability of any kind to Publisher.  Without limiting the foregoing, no Composition is or shall be a derivative of any other work, and no Person other than you owns any rights in any derivative work based on any Composition except as specifically stated on Schedule A.

(d)All rights and remedies in or pertaining to the Compositions granted to Publisher pursuant to this Agreement are and shall throughout the Term and Retention Period remain available to Publisher throughout the Territory without restriction or limitation, subject to local Society rules and Regulations.

(e)At no time shall Publisher be required to make any payments or credits, or have any liabilities or obligations of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Publisher pursuant to this Agreement except as specifically provided in this Agreement.  Without limiting the generality of the foregoing, you shall be solely responsible for any payments, liabilities or obligations due to the Controlled Songwriter and any third parties from whom you have acquired an interest in the Compositions.

(f)No advances shall be made at any time by ASCAP, BMI or any other third parties which are recoupable from income derived from any use of Your Interest in the Compositions and collectible by Publisher hereunder during the Term or Retention Period or Collection Period.  Throughout the Term and Retention Period, you are and shall remain entitled to be paid and to collect on all such income (including both the publisher and songwriter share), without deduction, encumbrance, set-off or other limitation, from the Effective Date hereof, subject only to the rights of Publisher.  The preceding two sentences shall not be construed to prevent you from obtaining an advance from  (or subsequent PRO) that is recoupable solely from your ?writer?s share? of public performance income derived from the Compositions and payable directly to you.

(g)You and the Controlled Songwriter are writer and publisher members (as applicable) in good standing of .  If at any time you and the Controlled Songwriter are not writer or publisher members in good standing of  (as applicable), you hereby grant Publisher the right to index Your Interest in the Compositions solely in its name,

# Sony Administrative Agreement

and to claim One Hundred percent (100%) of the publisher's share of public performance income with respect to the Compositions, until such time as you become writer member in good standing of  or a publisher member in good standing of , subject, however, to Publisher's crediting to you of your share of royalties collected by Publisher.  In the event that Publisher elects with your prior written consent, to pay performing rights Society membership fees on your behalf, which Publisher is not obligated to do, such payment shall constitute an Advance, for which Publisher will be entitled to reimburse itself from any monies payable to you hereunder.  In the event that at any time during the Term you or the Controlled Songwriter wish to become affiliated with a different Society, you shall give Publisher prior written Notice thereof, cooperate with Publisher throughout the affiliation process, and execute additional documentation reasonably requested by Publisher in order that such affiliation does not result in the diminution of any income payable to Publisher.

(h)You and the Controlled Songwriter will at all times use reasonable efforts to cause any other songwriter with whom the Controlled Songwriter writes during the Term to execute and deliver to Publisher any document it may reasonably require to effectuate its rights under this Agreement, including without limitation a co-administration agreement so that such songwriter shall not have the right to license Your Interest in any Composition, subject in each case to any pre-existing agreements between such other writer and any third-party music publisher.

(i)You and the Controlled Songwriter will at all times take no action (nor fail to take any required action) the result of which would be to derogate from or otherwise impair or limit the rights granted to Publisher hereunder.  Without limiting anything contained in the prior sentence, and subject to the resolution of the Claim, you and the Controlled Songwriter will at all times take no action (nor fail to take any required action) that will result in divestiture, reduction, limitation of, or otherwise affect any interest you may or should have in any Composition (for example, where a Composition is co-written by the Controlled Songwriter and any third-party songwriter(s), agreeing to a split with any other such songwriter(s), or otherwise granting any interest to any other such songwriter(s), that does not fairly and equitably reflect the Controlled Songwriter?s contribution to the Composition), unless Publisher consents in writing.

16.02During the Term, you and the Controlled Songwriter will not: (a) enter into any agreement, incur any

obligation, or suffer any liability which would interfere with the full and prompt performance of your obligations hereunder, or (b) except as otherwise expressly permitted hereunder, either directly or indirectly write musical compositions for, or Deliver or convey musical compositions or any interest therein to, any Person other than Publisher, or (c) otherwise act at any time in any manner inconsistent with Publisher?s rights or your obligations hereunder.

16.03All Affiliates of you and the Controlled Songwriter existing as of the Effective Date are hereby deemed parties to this Agreement and shall be bound by all terms hereof.  Upon formation subsequent to the Effective Date of an entity that is an Affiliate, you shall promptly notify Publisher in writing of such formation, and simultaneously therewith shall deliver to Publisher a counterpart to this Agreement executed by such Affiliate, binding such Affiliate as a party to this Agreement and subject to the terms and conditions hereof.  You hereby covenant, represent, warrant and personally guarantee that no Person who hereafter becomes an Affiliate shall have or be granted any right to the Controlled Songwriter?s services as a songwriter, or any rights, title or interest in any musical composition, unless and until said Affiliate duly executes a counterpart of this Agreement as set forth in the immediately preceding sentence.   Such execution shall not relieve you or the Controlled Songwriter of any of your warranties, representations, obligations or other agreements hereunder.

16.04   Without limitation of Publisher's exclusive rights hereunder, at no time during the Term or Retention Period shall you or the Controlled Songwriter grant to any record company or others any license with respect to any Composition, including, without limitation, any mechanical or other license for the reproduction of any Composition on Records (including, without limitation, audiovisual Records), unless otherwise expressly provided hereunder.

16.05The Compositions are unique and extraordinary.  You acknowledge and agree that should you or the Controlled Songwriter engage in any action which affects, hinders, or obstructs Publisher?s rights in and to any Composition(s), Publisher?s loss cannot be adequately compensated in damages, and Publisher shall be entitled to enjoin you from engaging in such action, and/or seek other injunctive or other equitable relief.  Nothing herein shall prevent you from opposing any claim for injunctive or other equitable relief on grounds

that do not negate your acknowledgements and agreements in this paragraph.

16.06You will at all times fully indemnify and hold harmless Publisher and/or its affiliates, employees, officers, directors, agents, distributors or Licensees (each, an ?Indemnified Party?) from and against any and all third-party claims, damages, liabilities, costs, losses and expenses, including reasonable outside legal expenses and reasonable outside counsel fees, arising out of any breach, or alleged breach, by you of any of your obligations, warranties or representations in this Agreement.  You will reimburse any Indemnified Party on demand for any payment made at any time after the date hereof for any liability or claim that has resulted in a final adverse judgment against Publisher or which has been settled by Publisher with your prior written consent.  Further, you will reimburse any Indemnified Party, on demand, for any reasonable out-of-pocket legal expenses (including, without limitation, outside counsel fees) incurred by any Indemnified Party in connection with any liability or claim arising out of any breach or alleged breach by you, of any of your obligations, warranties or representations in this Agreement, whether or not the related liability has resulted in a judgment or has been settled by Publisher with your prior written consent.  Publisher shall give you prompt Notice of each claim asserted against Publisher that is the subject of these indemnifications.  You shall have the right to participate in the defense of each such claim with attorneys of your choosing and at your sole cost and expense.  Pending the resolution of any claim in respect of which any Indemnified Party is entitled to be indemnified, Publisher may, in its discretion, withhold monies which would otherwise be payable to you in an amount not exceeding your reasonable potential liability to Publisher under this paragraph.  If a claim is asserted against Publisher and/or its Licensees and no action or proceeding is commenced within one year after Publisher's receipt of that claim, Publisher will, promptly following your request, release those withheld monies, unless Publisher reasonably considers that the commencement of an action or proceeding is imminent.  If Publisher continues to withhold monies following that 12 month period because Publisher considers the commencement of an action or other proceeding to be imminent, Publisher shall release such monies if that action or other proceeding has not been commenced within three months following that 12 month period.   In lieu of Publisher withholding such monies, you may make bonding arrangements, satisfactory to Publisher in its reasonable discretion, to assure Publisher of reimbursement for all damages,

liabilities, costs and expenses (including counsel fees and expenses) which Publisher and/or its Licensees may incur as a result of such claim.

16.07You will fully cooperate with Publisher throughout the Term and Retention Period in order that Publisher may participate with you in any music publishing industry awards applicable to the Compositions, including, without limitation, by executing (or procuring the execution of) any short-term assignments of copyright as may be required solely in order that Publisher may receive such an award, and for no other purpose.  For avoidance of doubt, any such assignment of copyright shall in no way diminish or otherwise affect any sums otherwise payable to you hereunder.  Publisher shall not have the right to assign or encumber any such copyright ownership interest assigned by you to Publisher pursuant to these terms, nor shall Publisher have any additional rights by virtue of such ownership interest except the right to participate in music publishing industry awards. Publisher shall re-assign to you any such copyright interest promptly following the expiration of the Term (or, promptly following Publisher?s receipt of the applicable award, if practicable).

16.08Your representations, warranties and indemnifications shall be effective and shall apply throughout the Term and Retention Period and shall survive the expiration of the Term and Retention Period hereof, unless otherwise expressly limited in time herein.

17.Agreements, Approval & Consent.

As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld and shall be deemed given unless you notify Publisher otherwise within ten (10) business days following the date of Publisher's written request therefor, except in those instances when a shorter time period is provided for in this Agreement.

18.Notices.

18.01Except as otherwise specifically provided for in this Agreement, all notices hereunder ("Notice(s)") shall be in writing.  Notices to you shall be given by personal delivery, certified mail return receipt requested, or by overnight courier (including but not limited to FedEx or UPS), to you at your address specified on page one or

at such other address as may be designated by you in writing under this paragraph. Courtesy copies of Notices to you shall be sent to your representatives  (Publisher?s failure to send such courtesy copy shall not affect the validity of such Notice, or be deemed a breach hereof.) You shall keep Publisher fully apprised at all times, during and after the Term, of your changes of address; this obligation shall be a material obligation and your failure to do so shall relieve Publisher of the obligation to render royalty accountings and payments to you until such time as you have provided Publisher with an updated address.  Statements of your Royalty Account, payments and courtesy copies of notices may be sent by ordinary mail.   In accordance with paragraph 12.04 above, statements of your Royalty Account may be sent via SCORE.  Notices to you shall be deemed given when mailed, except that Notice of change of address shall be effective only from the date of its receipt.  Notices to Publisher shall be given by personal delivery, certified mail return receipt requested, or by overnight courier (including but not limited to FedEx or UPS), to the address shown above.  Each Notice sent to Publisher shall be directed to the Chairman of Sony Music Publishing, with a copy of such Notice to be sent, simultaneously, to Sony Music Publishing?s Executive Vice-President, Legal and Business Affairs. Each Notice sent to Publisher shall be deemed given when received.  In order for any Notice given by you under this Agreement to be effective, such Notice must specifically refer to this paragraph 18 and any other applicable paragraph(s) of this Agreement that are the subject matter of the Notice.  It is the essence of this Agreement that wherever Notice is required to be given to Publisher, it is given in accordance with the terms of this paragraph 18, and wherever Publisher is to act within a certain time from receipt of Notice, such time period shall not begin to run unless and until Publisher receives Notice given in accordance with the terms of this paragraph 18, regardless of whether Publisher has received actual or constructive Notice through other means.  Publisher may, in its sole and absolute discretion, waive the provisions of the immediately preceding sentence.  Any such waiver shall be deemed to be a one-time waiver, and shall not constitute a waiver of Publisher?s future right to receive Notices strictly in accordance with this paragraph.

19.Force Majeure; Events of Default; Remedies.

19.01If because of: act of God; act of war; criminal or terrorist activity; unavoidable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order of act of any

government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; or other cause of a similar or different nature not reasonably within Publisher's control, or which would otherwise constitute force majeure, Publisher is materially hampered in the exploitation or administration of musical compositions, then, without limiting Publisher's rights, Publisher shall have the option by giving you Notice to suspend the Term for the duration of any such contingency (not to exceed six (6) months if the force majeure affects only Publisher, and not to exceed twelve (12) months if the force majeure affects a major portion of the music publishing industry) plus such additional time as is necessary so that Publisher shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the next following Option Period. Publisher will not withhold the payment of monies owed during the force majeure if Publisher continues to administer such payments for a majority of its royalty recipients.

19.02If you have materially breached any of your obligations under this Agreement, then Publisher will (subject to your ability to timely cure any breach under paragraph 23.02(b)) have the following options:

(a)to suspend the Term, and suspend Publisher's obligations to make payments or credits, or permit any examination pursuant to paragraph 12.03 hereunder, until you have cured the default (but Publisher will nonetheless continue to render statements to you); and/or

(b)to terminate the Term of this Agreement.

Publisher may exercise each of those options by sending you the appropriate Notice. If Publisher terminates the Term under subparagraph 19.02(b), all parties will be deemed to have fulfilled all of their obligations under this Agreement, except those obligations which survive the end of the Term (such as, and without limitation, the parties? obligations under paragraph 3.03). No exercise of an option under this paragraph will limit Publisher's rights, remedies or options under this Agreement, including but not limited to Publisher?s right to recover damages by reason of your default.

20.Assignment; Change of Control.

20.01(a) This Agreement, the rights, opportunities and obligations created pursuant to this Agreement, and any of your rights or interest in this Agreement and/or with respect to Compositions, are not assignable or

# Sony Administrative Agreement

transferable in any manner by you, nor shall you delegate any of your rights or obligations without the prior written consent of Publisher, except as set forth in paragraph 20.01(b).

(b)You shall have the right to assign your aggregate rights under this Agreement to a corporation or L.L.C. of which you are the sole shareholder (or, in the case of the L.L.C., sole member) and over which you exercise sole management control, provided that:

(i)No such assignment will be effective until Publisher has received written notice of such assignment, duly signed by you and such corporation, and relevant corporate documents reasonably satisfactory to Publisher;

(ii)Such corporation or L.L.C. must be duly incorporated or duly organized, as applicable, and in good standing in the jurisdiction of its incorporation or organization;

(iii)You shall remain personally responsible for all of the obligations, agreements, warranties and representations imposed upon you pursuant to this Agreement;

(iv)In no event will such assignment in any way affect the rights granted to Publisher pursuant to this Agreement;

(v)Publisher's inadvertent failure to comply with such assignment shall not constitute a breach of this Agreement; and

(vi)You and the assignee(s) shall execute, and deliver to Publisher, without charge, any additional instruments (in the nature of inducement letters, etc.) that Publisher may reasonably request.

20.02Publisher may assign its rights under this Agreement, in whole or in part, to any wholly or partly, directly or indirectly, owned subsidiary, affiliated company or controlling corporation of Publisher, to any person owning or acquiring a substantial portion of the stock or assets of Publisher, or to any partnership or other venture in which Publisher has an interest or participation (hereinafter an ?Authorized Assignee?), and such rights may be similarly assigned, in whole or in part, sequentially, by such assignee to another Authorized Assignee.  No such assignment shall relieve Publisher of any of its obligations hereunder. Publisher may also assign any of its rights, in whole or in part, to any of Publisher?s Licensees if advisable in its sole discretion to implement the license granted. Any other assignment by Publisher shall be subject to your written prior consent. You shall not have the right to assign this agreement or any of your rights

hereunder without the prior written consent of Publisher. Any purported assignment by you in violation of this paragraph shall be void.

21. Choice of Law/Venue.

21.01 This Agreement shall be deemed entered into in the State of New York and the validity, interpretation and legal effect of this Agreement shall be governed by the internal laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement or which in any other respect relates to this Agreement. Any process in any action or proceeding commenced in the courts of the State of New York or elsewhere arising out of any such claim, dispute or disagreement, may, among other methods, be served in the manner set forth in paragraph 18.01 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York or the jurisdiction in which such action or proceeding may be commenced. Any claim arising out of or relating to this Agreement or the transactions contemplated hereby shall be instituted and maintained exclusively in any federal or state court located within the County of New York in the State of New York. you irrevocably submit to the personal jurisdiction of such court, and agree not to assert, by way of motion, as a defense or otherwise, that (i) you are not subject personally to the jurisdiction of such court, (ii) the litigation is brought in an inconvenient forum, (iii) the venue of the litigation is improper or the litigation should be transferred for any reason to any other venue, or (iv) this Agreement or the subject matter hereof may not be enforced in or by such court.

22. Intentionally Deleted.

23. Miscellaneous.

23.01 This Agreement contains the entire understanding of the parties to this Agreement relating to the subject matter of this Agreement and cannot be changed, modified, amended, cancelled or terminated except by an express written instrument signed by an officer of Publisher and you. All prior and contemporaneous conversations, negotiations, agreements, and alleged agreements, representations, covenants and warranties concerning the subject matter of this Agreement are merged herein. This is a fully integrated

agreement.  No waiver by Publisher or modification of this Agreement shall be effective unless it is in writing and signed by Publisher's Chairman or Senior Vice President, Business and Legal Affairs, or such other authorized signatory of whom Publisher gives you Notice.

23.02(a)You shall not be entitled to recover damages or impose on Publisher any other remedy by reason of any breach by Publisher of its material obligations hereunder, if at all, unless Publisher has failed to remedy such breach within 30 days (10 days for monies actually due hereunder and not in dispute).  You shall not be entitled to recover damages or impose on Publisher any other remedy if such breach is not capable of cure. You acknowledge that your rights and entitlements under this Agreement are purely economic in nature, and that the impairment thereof is clearly calculable and compensable in damages.  You shall not, under any circumstances, be entitled to terminate this Agreement, based upon, without limitation, any claimed breach by Publisher, of which you give Notice to Publisher hereunder, whether or not the same is cured, and your sole and exclusive remedy shall be for money damages.

(b)Publisher shall not be entitled to recover damages or impose on you any other remedy by reason of any breach by you of your material obligations hereunder unless you have failed to remedy such breach within 30 days following your receipt of Publisher's notice thereof.  Notwithstanding anything to the contrary contained in this Paragraph 23.02(b), there shall be no "cure" period in connection with any breach by you of: (i) your obligations to Deliver all Compositions exclusively to Publisher during the Term (except as otherwise expressly permitted hereunder); and (ii) other obligations that are not capable of cure.

23.03You agree that any actual or threatened breach by you of this Agreement, including without limitation, any covenant, representation or warranty contained herein, shall cause Publisher to suffer immediate and irreparable harm for which Publisher shall not have an adequate remedy at law.  Accordingly, without in any way limiting or affecting any right or remedy Publisher has under this Agreement or otherwise, it is agreed that Publisher shall be entitled to seek immediate, temporary, preliminary and permanent injunctive or other equitable relief to prevent any threatened or actual violation of Publisher's rights under this Agreement. Nothing herein shall prevent you from opposing any claim for injunctive or other equitable relief on grounds that do not negate your acknowledgements and agreements in this paragraph.

23.04Any and all riders, exhibits and schedules annexed hereto, together with this basic document, shall be taken together to constitute the agreement between you and Publisher.

23.05All payments due to you pursuant to this Agreement shall be made payable to

23.06Each option granted to Publisher in this Agreement is separate and distinct, and the exercise of any such option will not operate as a waiver of any other option.

23.07If any part of this Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement will remain in full force and effect.

23.08Nothing herein contained shall create any association, partnership, joint venture or relationship of principal and agent between the parties hereto, it being understood that the parties hereto are with respect to each other independent contractors; and neither party shall have any authority to bind the other or the other's representatives in any way and shall not hold itself out to any third party as having such authority. Nothing herein shall act as a bar or limitation to Publisher?s entering into any agreement with any party which is similar or dissimilar to this Agreement.

23.09A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such condition for the future or of any subsequent breach thereof. Without limiting the force and effect of the foregoing, compliance with any provision of this Agreement may be waived by the party hereto entitled to demand such compliance; however, such waiver must be in writing. No waiver of a provision of this Agreement shall be construed as a continuing waiver of such provision (unless the writing waiving such compliance expressly sets forth the continuing waiver of the provision) or of any other provision. All remedies, rights, undertakings, obligations and agreements contained in this Agreement shall be cumulative, and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement or either party, whether expressed herein, or otherwise.

23.10If any period of time prescribed in this Agreement would expire on a Saturday, a Sunday, or any other day on which Publisher?s offices in New York City are not open for business, the period will be extended and continue throughout the next regular business day.

# Sony Administrative Agreement

24.Opportunity to Consult Independent Legal Counsel.

24.01YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE BEEN REPRESENTED BY INDEPENDENT COUNSEL OR HAVE HAD THE UNRESTRICTED OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF YOUR OWN CHOICE FOR PURPOSES OF ADVISING YOU IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT.  YOU WAIVE ANY CLAIM OR ANY DEFENSE TO THE FULL ENFORCEMENT BY PUBLISHER OF THIS AGREEMENT BASED ON THE LACK OF INDEPENDENT, COMPETENT, OR EXPERIENCED LEGAL REPRESENTATION.

AGREED:

SONY , A DIVISION OF SONY MUSIC PUBLISHING (US) LLC ()

By:_____

An Authorized Signatory

_____

RODNEY OLIVER, individually and d/b/a

PUBLISHING

and any and all Affiliates

ACKNOWLEDGEMENT

STATE OF)

) ss.:

COUNTY OF )

On _____, before me personally came RODNEY OLIVER, known to me to be the individual described in and who executed the foregoing instrument, and acknowledged to me that he executed it.

_____

Notary Public

SCHEDULE A

to the Agreement dated as of [DATE] between SONY , A DIVISION OF SONY MUSIC PUBLISHING (US)

# Sony Administrative Agreement

LLC (), on the one hand, and RODNEY OLIVER, individually and d/b/a PUBLISHING ) and any and all Affiliates, on the other hand.

(Reference paragraph 4.02)

---

Compositions

EXHIBIT A

to the Agreement dated as of [DATE] between SONY , A DIVISION OF SONY MUSIC PUBLISHING (US) LLC (), on the one hand, and RODNEY OLIVER, individually and d/b/a PUBLISHING ) and any and all Affiliates, on the other hand.

(Reference paragraph 7.01)

INTENTIONALLY OMITTED

EXHIBIT B

to the Agreement dated as of [DATE] between SONY , A DIVISION OF SONY MUSIC PUBLISHING (US) LLC (), on the one hand, and RODNEY OLIVER, individually and d/b/a PUBLISHING ) and any and all Affiliates, on the other hand.

(Reference paragraph 7.02)

DIRECTION LETTER

As of [DATE]

ALL RECORD MANUFACTURERS ALL PERFORMING RIGHTS

LICENSED TO MECHANICALLY SOCIETIES

REPRODUCE COMPOSITIONS SPECIFIED

HEREINBELOW

HARRY FOX AGENCYALL OTHER PARTIES IN INTEREST

Please be advised that effective as of [DATE], I have granted to SONY , A DIVISION OF SONY MUSIC PUBLISHING (US) LLC () (?Sony?) and its licensees, affiliates and assigns the sole and exclusive worldwide right to administer all musical compositions, including those compositions listed on Schedule A annexed

# Sony Administrative Agreement

(?Compositions?) (and the copyrights therein), that are subject to the agreement (?Agreement?) as between

Sony, on the one hand and the undersigned, on the other hand, including but not limited to the right:

(i)to license and cause others to license the use of the Compositions; and

(ii)to administer and grant rights in and to the Compositions and the copyrights therein; and

(iii)to publish and sell sheet music and/or folios of the Compositions if it so elects; and

(iv)to collect all monies payable with respect to the Compositions, including monies earned but not paid prior

to the effective date hereof; and

(v)to otherwise administer the Compositions and the copyrights therein and to act as the publisher thereof.

I expressly authorize and direct you to pay all such royalties and other sums which are or may become

payable to us pursuant to the Agreement to:

SONY

PO Box 415000

lkbx 30578

Nashville, TN  37241-5000

Important: all payments must be paid solely in the name, or credited to the account, of SONY .

This letter of direction may not be revoked, modified or terminated except by a written instrument signed by

the undersigned and Sony.  This letter is binding on any and all Affiliates of the undersigned.

Very truly yours,

_____

RODNEY OLIVER, individually and d/b/a

PUBLISHING ) and any and all Affiliates

EXHIBIT C

to the Agreement dated as of [DATE] between SONY , A DIVISION OF SONY MUSIC PUBLISHING (US)

LLC (), on the one hand, and RODNEY OLIVER, individually and d/b/a PUBLISHING ) and any and all

Affiliates, on the other hand.

(Reference paragraph 7.02)